377 So.2d 417 (1979)
J. Clint THORNTON, Plaintiff-Appellant,
v.
Carol Dean Smith THORNTON, Defendant-Appellee.
No. 13952.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1979.
Blackwell, Chambliss, Hobbs & Henry by Murphy Blackwell, Jr., West Monroe, for plaintiff-appellant.
Robert P. McLeod, Monroe, for defendant-appellee.
*418 Before PRICE, HALL and HOOD, JJ.
HALL, Judge.
A judgment of separation was rendered on the grounds of irreconcilable differences and custody of four minor children of the marriage was awarded to the father. The mother appealed from that part of the judgment dealing with custody. We affirm.
Mr. and Mrs. Thornton separated in May 1978 when the father moved out of the family home with the four children, then ages 14, 8, 7, and 5. He filed suit for separation on the grounds of cruel treatment and public defamation and sought custody of the children. An ex parte order granted him temporary custody pending trial of the custody rule. The mother reconvened for a separation on the grounds of cruel treatment, nonsupport, and public defamation and also sought custody of the children.
The custody rule was tried on June 21, 22, 23, 1978, and extensive testimony was offered by both parties. The hearing was continued and Mrs. Thornton was ordered to submit to a psychiatric examination by a psychiatrist appointed by the court. Pending completion of the evidence, Mr. Thornton's custody of the four minor children was continued with Mrs. Thornton receiving specific visitation privileges.
Three contempt rules were filed by appellant against appellee for failure of appellee to comply with the visitation privileges and other orders of the court. The court found appellee guilty of contempt on two of the occasions.
On August 14, 1978, after hearing testimony of the psychiatrist concerning his examination of Mrs. Thornton, the trial court awarded custody pendente lite of the four minor children to Mr. Thornton.
A joint petition for separation from bed and board based on irreconcilable differences was filed on February 9, 1979, with the stipulation that the court decide the matter of custody based on the evidence presented at the previous hearings. On February 10, 1979 the judgment granting a separation from bed and board and awarding custody of the four children to Mr. Thornton was signed. Mrs. Thornton appealed from the custody judgment.
Appellant contends that the trial court awarded custody to the father only because he had physical custody of the children from the time he left home and took them with him; that the evidence does not support a finding that the mother is unable or unfit to have custody; that it is in the best interest of young children to be in the custody of their mother; and that the evidence shows that the father is not fit to have custody.
The parties were married in 1963 after their graduation from high school. They lived in various places and both worked at various jobs. Mr. Thornton later attended Northeast Louisiana University and graduated with a degree in music. He worked primarily as a tile setter, was minister of music at the Church of God, and became Assistant Pastor of that church. The family's financial situation during most of the years of their marriage was limited and strained. Mr. Thornton spent a great deal of his time at the church, sometimes working until very late at night.
During 1976, while working at Howard Brothers Discount Stores in the accounting department, Mrs. Thornton developed an admiration or infatuation with the head of the department. She frequently called him on the telephone and would hang up when he answered. She only actually talked with him two or three times. The man reported the calls to her supervisor and she was warned not to do it again. After making another call, Mrs. Thornton's employment was terminated. She continued to call the man on occasion, hanging up when he answered. In October 1977 she wrote a note expressing her feelings and admiration for the man and left it in his car. At some point during this episode Mrs. Thornton wrote another note to the man which she crumpled up and put in the wastebasket, but which was found and read by one of her daughters. Mr. Thornton learned of this *419 situation and, because of it, had Mrs. Thornton "disfellowshipped" from the church. Their relationship at home became even more strained. Mrs. Thornton testified quite openly about her "fantasy" relationship with the man, but explained she admired him because she felt he was an ideal family man, something she did not think her husband was at the time.
About the end of 1977 or the beginning of 1978, Mrs. Thornton was persuaded to go to Confederate Memorial Hospital in Shreveport for psychiatric examination. She was afraid she might have Huntington's chorea, a hereditary disease of which her mother died and which her brother also had. Huntington's chorea is a degenerative nerve disease which inevitably causes psychosis. The first doctor who examined her reported she probably had the early symptoms of the disease and the second doctor who examined her thought she possibly had early symptoms.
The psychiatrist who examined Mrs. Thornton pursuant to court order on two occasions in July 1978, testified that the most appropriate psychiatric diagnosis for her is passive-aggressive personality. He felt Mrs. Thornton was inhibited in expressing her feelings of dissatisfaction and anger and she expresses those feelings in passive ways, consistent with some of the behavior described. The doctor felt she was a risk for Huntington's chorea but at the present time there was no findings to substantiate such a diagnosis. The doctor specifically stated he found no reason to conclude she is incompetent as a parent.
Numerous witnesses testified for both parties, primarily as to Mrs. Thornton's behavior. The witnesses called by the competing parties gave almost irreconcilable testimony. Most of the witnesses were members of the church, and were aligned according to whether they remained in the church or left after a split-up in the church in the latter part of 1977. As noted by the trial court, most of the father's witnesses were members of the church who had remained as members. Most of Mrs. Thornton's witnesses had been members of the church, but had left at the time the mother was expelled along with a large number of other members. Mr. Thornton's witnesses testified that the mother's behavior was erratic, nervous, first a good mood and then bad, withdrawn, could not control the children at church, etc. Mrs. Thornton's witnesses testified she was a model mother, quiet and pleasant, and had a good relationship with the children who were well disciplined. The trial court noted that much of the father's evidence bore on her behavior after January 1978 and that Mrs. Thornton's witnesses generally did not testify as to her behavior after that time. The trial court concluded that her personality, behavior, and ability to handle the children must have changed after that time.
The incident which immediately precipitated the separation of the parties occurred on Mothers Day, 1978. Although Mrs. Thornton expressed a strong desire to go to church, Mr. Thornton would not let her. She became very upset and choked the father with a belt, in front of the children.
The two eldest children testified. Although obviously influenced greatly by the father, the children expressed a strong desire to remain with him and expressed a real fear of their mother and concern about her erratic behavior. It was established that she had at least twice threatened suicide and locked herself in the bathroom with threats of turning the gas on.
The evidence establishes that Mr. Thornton's mother is available and willing to assist in caring for the children and that she lives nearby. There was evidence that the children have been well cared for and happy since the separation.
The evidence supports the trial court's conclusion that as between the mother and father, the father is, at this time, better suited to provide a suitable home for the children and that it is in their best interest to be in his custody. The evidence would not support a finding that the mother is incapable or unfitmorally, physically, or mentallyof taking care of the children. The evidence does, however, support a finding that she is less capable or fit, at this *420 time, than the father. The evidence establishes some degree of erratic and unpredictable behavior on her part in the months preceding the separation, which could be due to illness or to the strain of the marital unhappiness which had developed between her and her husband. The trial court found an increasing inability on her part to handle the children.
Appellant argues that since it was not established that the mother is unfit or incapable of caring for the children, custody should be awarded to her under the jurisprudential rule long recognized that it is in the best interest of young children to be cared for and in the custody of their mother. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971).
After LSA-C.C. Art. 157 was amended in 1977 to provide that custody should be granted to "the husband or the wife, in accordance with the best interest of the child or children," this court held that "the best interest of the child is the sole determination to be made in the initial granting of custody and the wife is granted no absolute preference in the determination." Hegan v. Hegan, 367 So.2d 147 (La.App. 2d Cir. 1979). We held that a close natural bond between a mother and a child was a factor to be considered, but the same factor could also weigh in favor of the father.
In Coltharp v. Coltharp, 368 So.2d 793 (La.App. 2d Cir. 1979), writ denied 370 So.2d 578 (1979), this court noted that the amendment to LSA-C.C. Art. 157 "could be construed to have legislatively eliminated the maternal preference rule", but that "[T]he amendment to the Article probably makes no change in the law since the maternal preference rule was always based upon the notion that it was to the best interest of a child of young and tender age to be placed in the custody of his mother at the time of the initial custody determination."
LSA-C.C. Art. 157 was amended again, along with LSA-C.C. Art. 146, by Act 718 of 1979, effective September 7, 1979. The two articles, as amended, provide:
Art. 146
"If there are children of the marriage, whose provisional keeping is claimed by both husband and wife, the suit being yet pending and undecided, it shall be granted to the husband or wife, in accordance with the best interest of the children. In all cases, the court shall inquire into the fitness of both the mother and the father and shall award custody to the parent the court finds will in all respects be in accordance with the best interest of the child or children. Such custody hearing may be held in private chambers of the judge."
Art. 157
"A. In all cases of separation and divorce, and changes of custody after an original award, permanent custody of the child or children shall be granted to the husband or the wife, in accordance with the best interest of the child or children, without any preference being given on the basis of the sex of the parent. Such custody hearing may be held in private chambers of the judge. The party under whose care the child or children is placed, or to whose care the child or children has been entrusted, shall of right become natural tutor or tutrix of said child or children to the same extent and with the same effect as if the other party had died."
It could hardly be more clear that the legislative intent is to do away with any legal preference or presumption in favor of the mother in custody disputes. The father and the mother stand on equal footing at the outset and the role of the court is to determine the best interest of the child based on the relative fitness and ability of the competing parents in all respects to care for the child.
The legislative amendments do not, however, do away with the real life fact, based on human experience, that it is often, in many if not most family circumstances, in the best interest of young children to be cared for by their mother. This nonmaterial concept remains a factor to be considered, along with many others, and will *421 often compete with more materialistic factors that favor the father. It is correct, however, that this concept does not create a preference or presumption in favor of the mother that must be overcome by proof of the mother's unfitness or incapability.
Considering all of the circumstances surrounding custody of the children involved in this case, we find the trial court soundly exercised its judgment and discretion in finding that, all respects considered, the best interest of these children will be served by granting custody to the father.
The judgment of the district court is affirmed at appellant's costs.
Affirmed.